20-1421 Coalition of MISO Transmission Customers et al. Petitioners v. Federal Energy Regulatory Commission Mr. Engelman for the petitioners, Mr. Glover for the respondents, Mr. Subdino for the intervenors. Thank you. Council for petitioners. Good morning. I'd like to reserve two minutes for rebuttal. Michael Engelman for petitioners, the Coalition of MISO Transmission Customers, the Industrial Energy Consumers of America, and L.S. Power Mid-Continent. The petitioners, two organizations that represent large consumers of energy in the Mid-Continent region, which is a 15-state region, and a MISO-approved qualified transmission developer filed a complaint under Section 206 of the Federal Power Act challenging the continued justness and reasonableness of a cost allocation provision in the Mid-Continent region that prohibits regional cost accountability for baseline reliability projects. The prohibition on regional cost accountability flies in the face of longstanding cost causation principles. To support their complaint, the petitioners provided an analysis of 29 of those baseline reliability projects planned between 2013, when the prohibition on regional cost accountability was implemented, through 2018. Before you get into that information, can I ask you a predicate question about standing? And that is, does your coalition or the Industrial Energy Consumers, do they have members in each of MISO's 24 pricing zones? They do. That's set forth on JA-29 through 31. The Coalition of MISO Transmission Customers – Let me catch up to you. JA-29 through 31. And that shows that you have – that says specifically that you have members in every zone? It says we have members throughout MISO. And you mean by that in each zone? In each zone, exactly. Well, that's two different statements, is it not? Throughout and each? Well, the – I mean, specificity is key here. Specificity is – can be key in a standing argument. But in this case, the petitioners filed a complaint under Section 206 of the Federal Power Act. And what they set forth was that they are harmed by the cost allocation provisions in MISO. They set forth for the coalition that their members are spread throughout MISO, that they use 8 billion kilowatt hours of electricity per year. And the Industrial Energy Consumers set forth that they also – their members are throughout MISO, that their members pay – or use 34 percent of the electricity consumed in MISO at a cost of $22 billion. OK, counsel. Large numbers is not the same. That's what we're trying to get at. And maybe you didn't offer that or your clients didn't offer it. Well, what we did offer is that – You're big. You're in the region. Where? Throughout the – And how specifically? And that's what we're looking for. I mean, I understand you filed a 206 complaint. You don't like the fact that these projects are not subject to competition. I understand that as a general objection. Sure. And what the petitioners put forth, again, is that they are throughout the region. Did we specify that we're in each pricing zone? No. But what we provided were examples throughout each part of MISO. And what we set forth was that the petitioners were throughout MISO and include a non-incumbent transmission developer, which we'll get to in a minute. But Sierra Club – sorry. No, you should finish your sentence. I'm sorry. What Sierra Club says that it's in most cases the petitioner standing to seek a review of administrative action is self-evident. And if the complainant is the object of the action or inaction at issue, as is the case usually in the review of a rulemaking and nearly always in the review of an adjudication, there is little question that the action or inaction caused injury. Well, we're raising it and we do that often, all right, because that's not an issue under Article III before the agency. And we've made it very clear in Sierra Club that if there is any question, then you acknowledge you haven't said in every. So that's all we're trying to get at, counsel. You file a complaint, you don't like the way the operator is limiting projects. Your Honor's question presumes that in order for the provision that we challenge to be unjust and unreasonable, we would have to show that we're in every transmission pricing. No, it presumes that the Supreme Court's Clapper decision means what it says. And the Clapper decision referred to an objectively reasonably likelihood of harm, of imminent harm. Because the petitioner is subject. I'm trying to get this distinction clear In my own mind, you can help me, not simply by repeating throughout and things like that. The imminent harm is the cost allocation provisions are applied on a project by project basis. And they prohibit the allocation of cost to anybody outside the zone in which a particular project is located. That's the LSP harm, but just backing up to the consumer's harm. Wait, I thought that was the consumer harm. That's the consumer harm. So part of it is you're saying more competition will necessarily lower prices, and it'll be felt that way. So it's piggybacking on the harm to LSP as a non-incumbent developer. It is in part, but it's not exclusively because what the petitioner said is their members are harmed each time there's an improper cost allocation. Right, and that's what I was trying to go back to and just clarify that even the notion that there are members in every zone, I'm not sure establishes harm because maybe more of the energy consumed is consumed in zones where there's benefit, but not price imposition for the development. And that's the kind of thing that typically we see in a declaration when a case comes by petition to us is something that really points to it. Here's where we are, and maybe we're inside of a zone where the benefits of the project are felt outside, but we're shouldering all the costs. We just don't know from the record before us where the big consumers in your client's coalition and organization are. And therefore, sort of the chapter and verse that supports the theory that the local pricing zone method more than the line outage method is going to burden them. It may be, depending on where they're are some of the people who get a free ride. And your honor, that's exactly the point that we made in asserting our standing to challenge the cost allocation rules. In general terms, but not by identifying here's a consumer, here's where they're located, this is outside, this project restricts cost recovery, or it's inside a pricing zone and the cost recovery is overburdening consumers within the zone. There's nothing, not even one explanation that's at that level of specificity. And so I think that's, I mean, theoretically, I understand your point. It's quite clear, but for purposes of that kind of standing, I'm not sure we have the information we need. Well, and we very much tried to provide you the information that was needed. Well, I thought you provided these studies that showed particular zones where they were really some up to like 60% where they weren't, the benefits were 60% elsewhere. So you have in your information, identified some zones, not all of which are even challenged by the information in front of us that shows some pretty disproportionate allocation of benefits. And so by telling us that you have members in every zone, you have sort of ifso facto identify that you have members who are cross subsidizing the provision of benefits to people, substantial benefits to people in other zones. So that information is in the record before us. It's just, it wasn't, it would have been helpful to have it all knit together in a declaration or something. We believe it's there in the record. And going back to Judge Pillard's point, what we pointed out and regarding the individual allocations is that, and why a membership committee is the appropriate one to bring this is because she's exactly right. Some members are harmed, some members are benefit, but the position that we've taken is that all members are harmed when there's improper cost allocation, because these members are very energy intensive and they compete on a lot of things, energy prices being one of them. In fact, the industrial energy consumers of America refer to themselves as energy intensive industries that have trade issues with that. So we laid out that as a association, their reason to challenge this is that some members are harmed, some members are hurt, but everybody's harmed by inappropriate cost allocation. Now, where in the record did you identify the members who are hurt? Individual members, Your Honor. Exactly. We did not individual. Right, we don't know who they are. Are the individual members identified anywhere in the record? The individual members are not identified in the record. They're identified as large industrial users and the Coalition of MISO Transmission Customers is actually a MISO member. They participate in all the MISO meetings as a MISO member representing these end users. Thank you. Anything further, though, that you'd like to point us to in the record other than the studies? Yeah, I want to point to the competition piece of standing. For standing, you only need to find one petitioner has standing. LS Power has identified that it's a qualified transmission developer. This cost allocation regime prohibits us from competing for any of these projects. Associated Gas and U.S. Telecom both assert that competition is appropriate for standing. Typically, on this side where there is a challenge to being cut out of competition, a petitioner will identify a project that is within, for example, in this situation where MISO has some projects that it's treating as baseline reliability projects. Were it not treating those as local, LSP would bid on. There's nothing that specific in this record, is there, identifying here's a project. I'm thinking, I mean, you've read our 2017 LS Power judgment. If we apply that here, why isn't that equally fatal? Because we identified 12 projects that we would have bid on, the 12 in the report that have significant benefits. If the cost allocation allowed recognition of those benefits, those would have been competed. Where can I find a statement such as a manager declaration or CEO declaration saying we would have bid on these? These ones that are erroneously treated as local rather than regional. Again, we say that at JA 29 through 31. In JA 463 through 464, we refer to the projects that MISO competed, LS Power 1. We've been consistent throughout that we compete on all projects, and we've spent thousands of dollars to become qualified. Where does it say in the record, in the sworn affidavit, that it competes on all projects? I mean, counsel, you've given us percentages, etc. Maybe we absolutely want to say some things on the merits, Your Honor, if you want to hear them. I mean, you're not providing us any specificity in the record, so I thought just so you have a chance to say what is not otherwise emphasized in your brief on the merits. Yes, on the merits, FERC's dismissal order didn't actually take on the evidence. The 12 projects that were identified, they never took on the percentages of costs that were inappropriately allocated. They simply said, well, it's okay. It's still mostly. For example, the court has no knowledge looking at JA 46 on project 12112 as to why it's just and reasonable to allocate $65 million to InterG Louisiana, 100% of the project cost, for a project when the neighboring utilities, Clico and Lafayette, get 58% of the benefits. Are you arguing the entire category have to fall because a subset of the projects don't primarily or have more than a de minimis benefit outside the pricing zone? Is that your view? I mean, it seems, just sort of to analogize, it seems like a facial attack. You're not saying, look, there's a subset of these that needs to be treated in a different category. The relief you're asking for is that the whole category is arbitrary and capricious, right? No, what we've asked for is that FERC set a just and reasonable rate that recognizes projects that have regional benefits. So that is a yes answer to the judge's question, is it not? Well, no, Judge Fuller asked if we were taking on the whole category. Well, how are you making it clear you're not? We made it clear in our section 206 request, we on part two of the section 206, we suggested using the light outage distribution factor, but we also said that it's up to FERC. So the projects that have significant regional benefits can be addressed without potentially addressing those projects that only have modest spillover of benefits, which is what FERC represented was going to be the case and what the Seventh Circuit relied on in affirming FERC is that there would only be a modest spillover of benefits. When you look at the individual projects, what modest spillover of benefits means could be open to debate, but for example, on one of the 2017 projects, there's a 0.005. That's a modest spillover of benefits, but there's also a 48% spillover of benefits, which is not modest. So FERC can address all of that on the second part of the section 206. What we've argued is an absolute prohibition on any regional cost allocation for baseline reliability projects is inappropriate. Now, where the line is drawn is the second step of the section 206, which FERC never got to. So FERC adopted a categorical rule here, and let's imagine you had done a study. I know this isn't your study, and you had found one case where there was a misallocation of benefits. So they have a categorical rule, and you do a study and find one case where there's a 67% misallocation between benefits, 67% benefits, but they're not paying anything in that zone. The zone that is paying is only getting, say, the 33% of the benefit. Would that be enough to take down a categorical rule? Would that make the categorical rule unreasonable, or we just have to have the ability to be able to challenge on a case-by-case basis? Well, it was challenged. That example was challenged in PSEDV FERC 989, Fed Third 10, where one project didn't fit the categorical analysis. Not a line outage distribution factor, that's what we used here, but a DFAX analysis, a distribution factor analysis was used because of the particular type of project there. That analysis didn't properly allocate benefits to the beneficiaries, and so what FERC did in that case was make an exception in the category that says, well, for this type of project, if this type of project comes up in the future, we're going to implement a different cost allocation methodology. It didn't otherwise take the categorical rule down. It simply said when you've identified either individually or by some sort of subset, some common factor, then we can adjust, but it didn't indict the entire categorical rule. But, and again, that was one instance. What we've produced here are 12 instances where the... Twelve out of how many? Well, 400, but the point is... I'm sorry, Your Honor. It's my, sorry. Maybe you're about to answer with your point. What I'm trying to get to is how do we know when it's too many so that it indicts the categorical rule as opposed to those are just situations where the categorical rule is pretty good, but there have to be sort of opportunities for as-applied challenges. I think in this case, it's an easy answer because the categorical rule is a prohibition on any regional cost allocation. So, in the other case, it was just an application of the rule, but here we have an absolute prohibition on any regional cost allocation, and that's the portion of the rule that's inappropriate. Go ahead. I'm sorry. That's what the court, this court looked at in the, sorry, in the... Sorry, the other case that I wanted to mention, the Old Dominion case. In that case, there was absolute prohibition on any regional cost allocation, and in that case, there were only two projects that the court focused on to find that they provided benefits beyond the local zone and therefore took down a categorical exclusion, and that's the same thing that we have here. And in that case, just one other thing on the overlap of those cases. In that case, what the fact that the allocation methodology that the commission had approved as showing the just and reasonable beneficiaries was the one that was used to show that the categorical exclusion didn't work, and that's the same thing we did here. We used the line outage distribution factor methodology, which FERC had approved for MISO to use for years to show that the assumption that there would be only a modest spillover of benefits was inaccurate. And so therefore, the absolute exclusion of any regional reliability was, or excuse me, any regional cost allocation was inappropriate. Although FERC has moved away from that methodology, and I know it didn't rely on that, on any criticism of that methodology in the order here, but there is something a little anomalous about using the prior methodology that appears to have been rejected as at least not worth the candle and perhaps measuring the wrong thing as a critique of the current rule. Two things. Actually, it wasn't rejected. It was just a 205 filing. Right. It was superseded. It was superseded. But the bigger point is FERC hasn't moved away from it. If you look at paragraph 88 of the order, FERC relies on that very methodology to support that most of the time what is required works. And that's the same methodology that it relied on in 2013 and the same methodology that it required MISO to file informational reports on. So FERC actually hasn't moved away from the methodology. And in fact, if you assert that the LLDF methodology doesn't measure beneficiaries, then FERC's entire analysis for why it changed the cost allocation is out the window because that is the entire basis on which it changed it was that the LLDF methodology measures beneficiaries. Most of those beneficiaries are local, and therefore it's appropriate to allocate all of the costs locally. I take your point. It's a good point. But I also think it's saying, you know, it measures beneficiaries, maybe it over measures them. And even under that method, it's not, there's not a lot of, you know, spillover effect. And therefore, we're going to take a more categorical approach. But I take your point. And again, Your Honor, the problem with a categorical approach is that for baseline reliability projects, they're individually cost allocated. Well, so the question I have is, you know, why are you not again, and this is the standing point, but maybe also getting to this issue of sort of as applied versus facial, why are you not saying, look, here's a project that is on deck, and it has benefits outside the pricing zone, and I want to compete for it. Like there's nothing that one of the things that says is, these are hypothetical, and you know, are they are any of them embraced within a planning process that then you can step forward and say, we are ready, willing and able to do this project. And it is representative of a broader problem for standing purposes, that would be extraordinarily helpful. And in terms of highlighting the scope of remedy that you're seeking, also helpful, but that's not what we've done. It's not what we've done for this reason. What we did was take projects over a number of years and show that this problem is continues to happen. Three projects in 2017, two in 2018, and ask for a change moving forward with 2019, so that those projects could be competed. The problem with focusing on individual projects is twofold. One is the project goes on. So even if we file a complaint that the cost allocation is wrong, the opportunity to compete has gone by the wayside. The project's been assigned, it's moved on. The cost allocation may get fixed later on down the road, but the opportunity to compete has been lost. And the consumers are very adamant that the opportunity to compete is an important part of their complaint. At JA-470, what the consumers noted was that competition just on the couple projects that happened has brought them better results than five years of litigation on ROE. Okay, counsel, we understand. I actually have a follow-up question, Judge Rodgers. Is that okay? Go ahead. So I know that this was a 206 petition and not a challenge. There's been original challenge to the rule, the Seventh Circuit case. But we had a standing rule that said even when FERC adopts a categorical prohibition on competition, in order to petition, you have to identify a specific project. How would that work since you only, in that situation, which is a little different from here, but in that situation, you only have 60 days to file your petition after FERC announces a rule with a categorical prohibition on competition. It seemed to me a rather difficult situation. In our unpublished LSP case, we didn't have a categorical prohibition like this one. So it does seem to be a bit odd to say you've got 60 days to find a project where you can't challenge the rule at all. And actually in LSP, one piece of that down the road. That was part of the problem there. That's very different from this situation though. I know we're not doing the original challenge to the rule, but if we adopt a standing theory here, presumably would apply in that situation. I think when you have categorical prohibition, like what you said, that's what you're challenging here. You have to assume you're right on the merits of this stage for purposes of assessing standing. It'd be quite hard for someone to identify a project within 60 days. You tell me. I don't know. Maybe you can find some. I don't know. Well, I think what we tried to do, Your Honor, is to identify 12 projects that have passed that would have fit the bill. Right. Well, you were doing a longer period of time. Right. But we asked for a change in 2019. Now, part of the difficulty in Judge Pillard's question is filing a complaint is we don't have the models to know which ones have the big spillover benefits. And so MISO, because they're now using this location-based cost allocation, doesn't release the models until after the fact to show which projects have the benefits that go beyond the zone. So we're going to be hamstrung to wait for the models. In our case, we put in a complaint that the models were supposed to be out in February. They didn't come out while we were litigating that complaint. Have they come out yet? They have come out now. It was after, was it while it was still before FERC or after FERC? I do not believe it was while it was still before FERC. Is it before you filed your petition here? Sure, because the FERC case took a while. So I guess the point in this area would be, would it not, that an affidavit spelling all this out of impossibility would have helped, but that's not here. And furthermore, these projects don't appear overnight. They take years of development. Your client is a big operator, probably knows what's coming on board for the next decade. And there are many ways to indicate that, you know, Project X is something we would want to compete for. That's what I don't understand, why that's impossible. And there's nothing in the record to say it is impossible. And Your Honor, at the risk of repeating myself, we've represented that by becoming qualified, by paying thousands of dollars to become qualified, by submitting hundreds and hundreds of pages of to compete on any project that might so compete. With all due respect, counsel, you know, this court is a lower court. So help us out in finding the sort of standing as the Supreme Court has tightened its standing requirements. And we believe that we fully have met those requirements. These are not Sunday intentions. Why don't we hear from counsel for respondent. Counsel for respondent. Thank you, Your Honor. May it please the court, I'm Matthew Glover, and I represent respondent, the Federal Energy Regulatory Commission. If it's all right with the court, I'd like to start with something that I think was in the middle of Mr. Engleman's discussion, where he was talking about challenging the category and providing evidence that there's only a modest spillover. The first point I'd make on that, which is actually technically jurisdictional, and maybe I didn't do a great job in the brief and pointing out that collateral attacks are jurisdictional. But in the 2013 and 2014 order, and the 2014 rehearing order that culminated in the Seventh Circuit proceeding, parties including LS Power specifically argued that, and I hate to read, but I do think it's helpful to read from paragraph, I guess I've misplaced it, 521 of the 2013 order. The commission explained that protesters argued that because a portion of the costs of some baseline reliability projects were then under the line outage method, being allocated to the pricing zones other than the pricing zone in which the project is located, some baseline reliability projects provide benefits outside of the zone, and thus the costs are not allocated roughly commensurate with the benefits. It's 521 of the 2013 order, which we cited in our brief, and I think we take this part of it in our brief maybe around 38, but the 2013 order's FERC citation is 142 FERC paragraph 61, 215. And I guess just the point is that parties there, including LS Power, had argued that the fact that using the line outage method, any one project might have had their benefits spread between zones showed that it wasn't just and reasonable and didn't comport with cost causation. To switch to a categorical method, the commission was unequivocal. We disagree. The commission must demonstrate that there's an articulable, plausible reason to believe that costs will be allocated at least roughly commensurate with benefits. As we found above, they call them MISO, what we use mid-continent, has presented convincing support for its claim that the pricing zone in which a baseline priority project is located receives most of the benefits provided by that project, and therefore we find assigning all of the associated costs to that pricing zone results in an allocation of costs that's roughly commensurate to the distribution. But I think what they're saying here is, look, now we've got experience and information, and you've got arguments on, we've got arguments on that. We've got experience and information both in the number, the volume of projects, and there's debates about that, but the sheer volume of projects where there's a misallocation in their view, plus something that was emphasized heavily to the Seventh Circuit is, don't worry, when there's something that's regional, it'll be called a multivalued project, and they'll be able to compete, and there'll be these, and these other sources, so they will, there's these other things that didn't materialize. In fact, you already knew it hadn't materialized at the time you told the Seventh Circuit that, I mean, three or four years had passed by the time, three years, I guess, had passed by the time you told that to the Seventh Circuit, not you personally, to the Seventh Circuit. I mean, the answer is we aren't going to have those projects because we already had a glut of things that have been pre-authorized. You knew that long before, Commission, forgive me, knew that long before they assured the Seventh Circuit there'd be all these opportunities for competition. So, I think there's two parts to your question going to the merits of their circumstances. The first is the evidence post the 2013 and 14 proceedings, and the second is the multivalued projects. If I might, I'll start with the evidence after the 2013-14 proceeding and then address the multivalued projects, unless you'd prefer that I start with multivalued. You were sort of saying, trying to make this a collateral attack, and what I'm saying is that, in two ways, they say it's not a collateral attack, and so I don't know if you want to, I'm not here, I'm not yet, yet raising the question of the merits issues there, but simply that, in fact, they think we're trying to raise collateral attack as a jurisdictional point. They've got two distinct arguments here, and I guess what I'm more interested in is why did the FERC emphasize so heavily to the Seventh Circuit that, don't worry, there's all these multivalued and other projects coming for which they'll be able to compete, when even by, was it 2016 that argument was? You already knew about the glut of pre-authorized projects. You knew was coming down the line, so why did they tell the Seventh Circuit that if, in fact, the very reasons we're now told, for there not being those multivalued projects, were already known and well and long in existence at the time of the Seventh Circuit argument? Understood, Your Honor. Starting with the collateral attack, I only meant that the argument that the existence of any project that would have cost-sharing means that, sort of, the facial categorical attack is identical to the facial categorical attack they made there. As to the merits of a changed circumstances argument on the multivalued projects, I don't think the Commission hid the existence of the $6.75 billion portfolio that I believe was approved in 2011. In fact, I think it's paragraph 502 of the 2013 order. The Commission mentions that that portfolio eliminated the need for 23 baseline reliability projects. Here, in paragraph 89, the Commission says, you know, we predicted that there would be a lot of occurred, which includes the large portfolio that was approved in 2011, and I understand it's still being constructed or just being completed construction, but it also includes things like the change in natural gas pricing and the change in inputs and the retirement of some facilities. That affects the economics of whether it's... How much of that was known at the time of the Seventh Circuit case? I think at the time of the Seventh Circuit case, the portfolio was known, and in the Seventh Circuit case, and I'm not sure if we put it in our appellate filings, but it was certainly mentioned in the 2013 order. I believe it might have been the 2014 review order. Right, but it wasn't really emphasized to the Seventh Circuit at all. That it eliminated the need for 23 baseline reliability projects during that period, and that was a period prior to the MidCon and South integration, so that elimination of 23 projects would have been a larger percentage of, say, the baseline reliability projects that were order 1000, both in that proceeding and here, is that order 1000 doesn't require you to have a category that would include reliability projects that cost share that is always going to sort of displace baseline reliability projects. We predicted that it would displace them. That prediction hasn't played out, but in paragraph 89 here, we credited MidContinent's explanation for why there haven't been more multivalued projects. I understand why you've done that now. I'm confused as to how the Seventh Circuit was led to believe and seem quite assured in their decision and at oral argument that these other opportunities for competition were going to be there that never materialized. It seems a bit troubling. It certainly precludes an argument about a collateral attack here now that they've got more information. I don't think it would preclude an argument that categorically you can't eliminate cost sharing if only one project were to have cost sharing. No, but they're not arguing if only one. They're not arguing if only one. We can put through debates about how many examples they've shown that are viable, but they're not saying, I mean, I asked them a prior argument if there's just one, but that's not their argument. Now, I think, I assume Burke would agree if, even they don't say this is this case, but if it turned out that 50% of the projects had more than 50% misallocation between costs and benefits, that that could be raised later, and it wouldn't be considered a categorical attack. You just can't have your categorical rule when half the time it's wrong, right? So, that would be, I think, evidence of changed circumstances, and if I might address the evidence of changed circumstances, they keep, you know, noting that the Seventh Circuit described it as a modest spillover, and we discussed the statistics and the updated statistics in paragraph 30, page 32 to 33 of our brief, but, you know, in preparing for argument, I realized it may have been more helpful for you to have put a chart in there that showed, because at the time of the 2013 order... Well, then Helpless Burke could put a chart but it's a little hard for you to do it for them, right? Fair enough, Your Honor, but at the time of the 2013 decision that was looking at the planning cycles before that, Burke noted that 80% of the baseline reliability projects would have had 75% of their costs, had, because they were applying the line adjustment, had 75% of their costs allocated locally, and in the informational filings that Burke required from... 20% is a lot, 20% is a lot. Well, so, that's the spillover that the Seventh Circuit described as modest. It was 80% of projects having 25, or having 75% or more allocated locally. You know, when the Seventh Circuit used modest, it was describing that, you know, the statistics that we had and McConnett had put before them were that, and that the second statistic from that time was that more than half of the projects had 90% or greater allocated. I know, but more than half could be 51%. Understood, and that's why I want to point to the informational filings that McConnett did in 2016 and 17 that we have in front of us in this record. Those showed that for, again, in 2013, the statistic was that 80% of projects would have 75% or more allocated. Where does Burke rely on that in its decision? At JA, or paragraph 88, I think it's JA 532, the description of these updated informational filings, and I think it's 532, but I'm looking at non-JA paginated paragraph 88. It showed that 80% of projects would have had 100% of their costs allocated locally. So, at the time of the Seventh Circuit, or the evidence in the Seventh Circuit proceedings showed 80% of projects would have 75% allocated locally. The next two years, analyzing the 130 projects approved in those two years, 80% would have 100% allocated locally, and then the second part of that statistic was that of the projects that would have been eligible for cost sharing at all, 93.9% or 46 of 49 would have retained 75% locally. So, you went from retaining 75% locally for 80% of the projects to 93.9. So, if anything, the change circumstances that those informational filings showed was that there was fewer projects having spillover, and fewer projects having large percentages of spillover. So, in terms of the change circumstances, the record here suggests... Okay, but then they had their... So, that's a very fair point. They had their... Is it pronounced Tara Report, or is it the Tara? I actually don't know. I've been I'll be correct. I'm happy to stay uncorrected. And all I got from FERC is that the median findings are mixed. The sample of projects is highly selective. I don't know what that means, other than people tend to do reports that show what it is they want it to show. And then the MESA makes compelling arguments, but doesn't identify which of the arguments it's adopting, only that MESA makes compelling arguments that it may contain significant errors. What am I supposed to do with that as a response to this evidence about the Tara Report? That's pretty vague. And they can't be adopting all of MESA's arguments, because MESA was saying just don't use the LIME method anyhow. And we know FERC has not let go of that yet. So, I'm not sure what to do with this. Sorry. And I know I'm in the red light, but if it's okay with the CORDA, I'll answer your question. I think that the commit, I guess, stepping back, the point of this proceeding is that it's a Section 206 proceeding. And so, the petitioners, coalition, et cetera, had the burden of showing that the circumstances had so changed since the 2013 and 14 proceedings, and the 7th Circus 2016 ruling, that using the current local cost allocation, which was found to be just and reasonable, is no longer just and reasonable. So, they had this significant burden of showing that what was just and reasonable a few years ago is no longer. They presented these 12 projects. As we noted, they looked at 31 total, I guess, and that was highly selective. Four of those were not actually baseline reliability projects. And I think the statement that the value and meaning of the Tara Report is mixed, and MidContinent has contrary evidence, is essentially to say, you had a significant burden to show there were such changed circumstances that the current cost allocation is no longer just and reasonable. But their evidence identified some projects that had, were, I think, 50, 60, and 65 percent of the costs were misallocated. And those weren't ones that NISO's other, you know, more particularized arguments knocked out. Those ones were left standing, even with the so-called, the information that the Commission references here that NISO made. And I assume the Commission's position isn't that 50, 60, 65 percent is a modest spillover. You know, the Commission didn't address that. Again, the modest spillover was the number of projects having spillover. But I think that the problem, and this goes back to the sort of, I believe it was Judge Pillar was asking whether it was an as-applied or facial attack. They were saying that using this model is unjust and unreasonable. And we had found that with those to switch to this model. And so, identifying, I think you noted three percentage or three projects, I'll say. Identifying those three projects, given everything else in the record, the Commission did not find that this report, the terror per terror report, met their burden of showing what was just and reasonable merely a couple years ago is no longer. And so, they didn't challenge, you know, this specific project is definitely going. Oh, could they? That's why I'm, so that's why I'm going to clear up if I can. Because they say, we're challenged in the fact that you have a flat prohibition and that you, you know, I guess their view would be that you should have something that wouldn't be such a flat prohibition, would be more context specific. Does the Commission agree? And I understand there's all kinds of arguments for why it's, we want to have a more administrable upfront rule. Does the Commission dispute that if someone were to come in and say, here's a project, and whatever method of measurement you want to use, guess what happens? It's off by 65 percent. That then, that someone could bring that focus, that as applied challenge to that project, and FERC would entertain it? Or would it say, too bad, that's what categorical rules are for? Your Honor, I think, you know, obviously there might be issues in terms of standing, et cetera. But like, I think you, if you were a rate payer currently paying the costs of some project, and you allege that that project was, you know, grossly disproportionate, you would file a Section 206 proceeding and say, I'm a rate payer, my current rates are. I'm not asking what they would do. I'm asking whether FERC would say, would recognize that as a valid challenge, or would they go, you know, what part of categorical don't you understand? You know, I assume that the Commission wouldn't entertain that, but I can't think of a specific case that involved that type of challenge, sort of in my experience with the Commission. Because then we have the problem of, you know, if we're unsure whether they could do that, then this really does become an argument about whether you can have that rigid a categorical rule, which certainly caused trouble for the Commission and Old Dominion. And so I know I go through all the distinctions on that case, but what happened there is you had a rule, something was sucked in, and it shouldn't have been. And the argument, in my hypothetical, is this project was sucked in, and it shouldn't have been because it's so misallocated. And it seems different. If they have to show that, if you treat them like we would, and this may be the wrong analogy, but sort of facial versus as applied challenges, then that's fine. That's one thing. But if the Commission's categorical rule is, I don't care if it's misallocated 99% of it, and you have customers identified with affidavits complaining, and LS there with its paperwork ready to compete, we're going to say, tough luck. That's what a categorical rule means. And I think that looks like a different categorical rule than maybe the one the Seventh Circuit thought it was looking at. So I think a customer certainly can come forward and say, the rates I am paying are not just unreasonable, and here is why. I'm paying the costs for this baseline reliability project in the zone that I live that occurs, but the benefits are outside, et cetera, et cetera. And then the Commission would have to- Why isn't that this case with the industrial consumer? Because they haven't alleged, they're not seeking to change the cost allocation of any specific project. I think the response I was giving to Judge Millett is, if you were alleging your current rate was unjust and reasonable because this specific project that you were paying for, I think the hypothetical she gave me was a project where it was 99%, but you were a rate payer for that specific project, because hypothetical project A, let's say it's in the Excel zone. You said, I'm in the Excel zone, and I'm currently paying for it. It's not an old project I previously paid for that the rate I'm currently paying for this project that really has 99% benefits elsewhere. Is that even a workable way to do it, Bill? I mean, are the consumers or even someone who wants to compete going to have the information in a timely manner to challenge, if there is a FERC authorization, that project? I'm not sure they're challenging. You say they can't challenge the tariff writ large to the extent it includes this categorical rule. And so, what would be timely? Can they bring that anytime they finally get the information in hand about how these things are misallocated? You know, I confess I don't know if the cost of these projects, particularly the more expensive ones, I assume are going to be cost allocated over a few years of rates. So, I think you would have a window, but, you know, mid-continent. Is it a timely window? I don't know what's the time. I mean, I don't want to be told that there's a solution here that doesn't actually exist in reality. So, I don't know sort of what the timeliness of that would be. But again, if you're challenging our categorical rule as a facial matter, you needed to show change. I just want to accept that you're, I'm sorry, can I just clarify this? As a facial matter, that what the commission is adopting is this, what we use as courts and other contacts between what they're saying now is, well, our categorical rule is facially valid. You can't show it's wrong. It's certainly right in many circumstances, maybe most is what the commission would say. Didn't say most of the time it's right. But that never precludes an as-applied challenge. And people could come in project by project and say, you know, and I'm sure they'll fight about what the right number is for a misallocation. But let's say we'll just say that over 50%, that's hard to call a modest spillover. I see those projects and say, you can't apply the categorical rule to this project. Just like you put in an old dominion, you can't do it here because it's causing the rates this point for this project to be unjust and unreasonable. And the commission's not going to say money is fungible and you're paying for lots of things. Your rate reflects a lot of different factors all at once. No one has a rate just for one project. And we said it was categorical. And the hard thing about categorical lines sometimes, bad things fall within them. That's not the commission's view. They are of the view when you said facial, that there could be an as-applied challenge. You know, I assume, particularly as you laid out the hypothetical, again, the rate payer is then currently paying some rate. And I don't think the commission would say, well, your rate includes a lot of things because this is a cost-based rate. So it would actually, I believe, specify like what you're paying for this project or the, not necessarily you, the individual transmission customer, but all transmission customers in that zone. So I do think that the rate structure would provide for that sort of as-applied challenge. Again, the challenge here was to show that the commission's cost allocation methodology is no longer just and reasonable. But let me ask a question about that. You agree that the current method only works most of the time and you seem to take the position that that is good enough. In the reply, Mr. Engelman argues that cost causation can, it's permissible for cost causation to be imperfect to meet other policy objectives. That seems to be what the precedent allows. What was the other policy objective that FERC was identifying here in embracing this treatment of baseline reliability projects over the line average? I think I have a couple of responses to that. The first one is the commission within the 2013 proceeding and 2014 proceeding, the commission was making the determination that local cost-based allocation for baseline reliability projects was just and reasonable. And I don't take the commission in the order, and I certainly didn't mean to say that local cost allocation is right most of the time. The commission said in the 2013 order and reiterated here that it had said in the 2013 order that because reliability concerns on local systems are what lead to or cause the burden to create baseline reliability projects, it thought local allocation of baseline reliability projects then was just and reasonable and continues to be just and reasonable. And it's just sort of the additional, I think, factors, which is the language from Carnegie, GAS, and the 1992 case, and a handful of other cases talking about when you can pick between different methodologies. That wouldn't have been at issue here because the question here was whether what had already been approved continued to be just and reasonable or whether new evidence showed that it wasn't. I think in looking at the 2013 and 2014 proceedings, I looked at the orders, you know, the commission emphasized, and I guess we did note that Mid Continent put similar evidence in here, that they put in evidence that it's a local transmission provider who is causing the need for a baseline reliability project. The project fix is usually on one or a couple of their systems or lines that will be within their footprint. And so, you know, they provided testimony here, which was similar to what they had said in the previous case, that local cost allocation, you know, recognizes that the purpose of these projects is to solve a local reliability violation or a violation of the national standards that's occurring on a local or specific entity's units. But here we were being asked, have petitioners met their burden to show that the circumstances have so changed that what was just and reasonable a few years ago is no longer just and reasonable? And the commission said that they didn't meet their burden. That's where the language Judge Millett and I were discussing about the tear-out report being. Right. What about the problem that in the 2013-2014 proceeding relied on the prospect that MEPs and MVPs would displace ERPs, but that just hasn't happened? I mean, we've seen a slew of these cases, and Mr. Engelman is in many, if not all of them, where there's sort of a calling out of the commission for an Order 1000 saying, we're going to do a lot more competition, and that's going to be good for ratepayers, that's going to bring prices down. And then it seems like almost everywhere we've turned, whoops, no competition here, no competition there, no competition everywhere. Is there some way you can help us understand why this isn't just sort of undermining the premise? I mean, I appreciate the legal arguments in each individual case, but can you give us any sort of more big picture assurance about the situation? Your Honor, I've been focused mostly on the baseline reliability projects. I know the companion case is going to talk about the exception for immediate need reliability projects, but I think FERC did note, at least here, as to competition that, I think it's footnote 254, and sorry, I don't have the JA page, but that in the orders, which you'll discuss in the next case, they were lowering the voltage for market efficiency projects, which in theory will lead to more competitive projects. But as to the lack of multi-value projects and competition since the 2011 $6.5 billion portfolio that's still being put in, the commission said in, I believe it's paragraph 89, that they credited mid-continent explanations, which included the different I don't mean to sort of retread anything, but on the broader question, I'm not sure that I have anything from the record in this proceeding or that I've sort of delved deeply into that. I don't want to throw my colleague under the bus. She has more experience at the commission than I do, but I think, and I know you had a case last week dealing with the immediate need reliability exception in the New England system, so I don't want to speak to issues in those cases, and I apologize, I don't have a better answer. Can I ask one more question, then? Do you dispute that the coalition and industrial energy consumers have members in each piece of the pricing bill? I did not see that in the record. I mean, I should have thought FERC would know a lot about these folks by now, but maybe not. Maybe that's my fault. FERC wouldn't care, I guess. I didn't question. I don't think that we know that from the record here. I think the coalition describes itself as an ad hoc membership organization. They have members throughout, and I think, it may not be the most precise term, but a literal reading of throughout means we've got them everywhere. That's what throughout means. We've got them everywhere. You don't dispute that? I don't dispute that they said throughout. I, when I read their complaint and looked at those pages 29 to 31, you know, did not see them state that they have pricing zone. I didn't see them state we have members in the pricing zones that have been allocated, you know, costs that we think were misallocated using the terror report. I didn't see them point to any of those sort of statements. I was, you know, they didn't provide a declaration or affidavit. This court in Delaware Department of Environmental Control, 785F31, which we cite in our brief, not for this point, but has said, you know, you leave an entertainer, you have declaration with a reply brief. We raised an issue with their standing in our brief. You know, they didn't come forward with these additional facts that you were discussing with Mr. Engelman, and so I just didn't see, and I haven't seen in the record, you know, statements to the effect that they have parties everywhere or that one of their members is over or underpaying. Consumers being interested in competition, it seems like a general interest, but, you know, I'm happy to answer other questions on standing over time. Thank you. So, why don't we hear from counsel for intervenors? Counsel for intervenors. Yes, Your Honor. Can you hear me? Yes, I can. Thank you. Sorry, I had to switch over to my phone due to technical issues. May it please the court, my name is Christopher Cepino of the Mid-Continent Independent System Operator, MISO or Mid-Continent, speaking on behalf of the intervenors for respondents. We're here today on Petitioner's second attempt to compel MISO to use their preferred methodology, the line outage distribution factor, to allocate the cost of baseline reliability projects. They have completely failed to carry their burden of demonstrating that MISO's current methodology is unjust and unreasonable. Their argument is built entirely on a flawed LODF analysis performed by their expert witness that fails to distinguish between impacts and benefits and assumes its own conclusion, an argument that confuses the source of reliability obligation with the scope of the benefits provided from a BRP, and a mistaken belief that BRPs only remain local if there are also approved MVPs that they will have the opportunity. You talk about the failure to distinguish impacts and benefits, but that's not a basis that the commission relied on in rejecting their to a fixed challenge here, right? I mean, in fact, as Mr. Engelman pointed out, the commission itself has relied on the line outage method as a sort of valid inquiry in various contexts, even after it replaced the method here. One, they didn't rely on it, and two, is it really flawed in the way that you say for failing to distinguish impact from benefits? Thank you, Your Honor. Those are two questions. I'll try to answer each of those separately. First, the commission did recite in their order our arguments, and on paragraphs 86 through 88, while they did not state exactly which of the arguments they found persuasive, they indicated that the burden was not proven and that they have not moved the ball from where we were in 2013. So, you can read into, do they have to adopt every one of our arguments in order to say that the petitioners haven't proven their burden when they haven't proven their burden? So, how do we know which one to, I guess, sorry, just to follow up on that, I don't know how we know why the commission, we know why MISA didn't like the terror report. I don't know how we know why the commission didn't. It says they're mixed. Well, that means some things, mixed means there's some helpful things, there's some informative things. It doesn't mean it's all bad. It's mixed. So, that's pretty vague. And then it says the sample of projects is highly selective. I don't even know what they mean by that. People, expert reports always support that person's side. So, I don't know if they just mean we don't look at expert reports that support that person's side. That would be, FERC would be out of business. So, I don't know what that means. And then all it says is MISA makes some compelling arguments, but some, you know, one, the attack on the methodology is one that the commission itself has never embraced. And I should think if it was going to embrace it, would do it more specifically than this. And so, I just, I don't know how we know you have, you have evidence that's put forward here. And if an agency says, well, it's mixed, it has, which I interpret as it has some important, helpful information, and it has some not so good. And it's selective in that it supports their position. Is that really grappling with the evidence that's been put before it? Yes, Your Honor. I believe that it is. If you look at paragraph 86 of the order on page 530 of the joint appendix, say that complainants have not demonstrated that the current BRP cost allocation methodology is unreasonable because the record isn't sufficient for us to conclude that the pricing dome does not receive the majority of the benefits. Our entire argument- It certainly is for a number of examples. It certainly is for a number of examples in the report. Now, we can argue about whether four is enough, five is enough, 12 is enough. But there certainly were some that definitely, absolutely did that with 65%, 60%, 50%. So, I don't know what to make of that. Your Honor, our position is that assumes the correctness of the LODF methodology. The commission- And I think we have to assume that because FERC embraced it, FERC uses that in its position, it's used it repeatedly. And I know that MISO has its I don't know how we can make this opinion that it's FERC embracing that argument. Can we? Your Honor, yes, you can. Because if FERC embraces the arguments that the primary beneficiary or the primary benefit of these projects is to resolve the local reliability violation, LODF doesn't measure that. In fact, it completely ignores the ability of the- It completely ignores the constraints. I'm not aware of anywhere in this proceeding or in 2013 where FERC or the commission or even Alice Power has argued or petitioners have argued that a flow change in and of itself is a benefit. Definitionally, it is not. It's a flow change. I understand your argument about that, but I don't know how I could say, we as a court could say that's what the commission meant. Because they rely on the line definition. I'm not using the right terminology, but they rely on that exact same test in their opinion. They've relied on it pretty consistently. So I don't know how we can say that. That might be what they meant, but they surely haven't said it. Your Honor, again, I understand that viewpoint. Our view is that they have said that the primary benefit is resolving the local reliability violation. So if you say that that is the primary benefit and that's one benefit, then the idea that an LODF analysis must supply an alternative is mistaken. There's no other way to read their decision, but it's absolutely 100% certain that's meant. Your Honor, I can't say there's no other way to read their decision. However, what I can say is that there is a reading of that, and the most sensible reading is that BRPs have not been shown to not be primarily to resolve local reliability violations. LODF method has been used by the Commission as both a proxy for determining benefits. It's never been asserted to in and of itself be benefits. But we don't see how it disturbs that conclusion. If the primary benefits are the transmission owner has to mitigate reliability constraints on a system, and the BRP is necessary to do that, what does the petitioner have to show in order to say that benefits are going outside of the zone? Bear in mind, Your Honor, that under the hierarchy that MISO has, any project that produces an actual regional economic benefit is going to be an NEP if it produces regional reliability. Their report says that hasn't happened. They identify a number of situations. Now, I'm not sure to say whether that's enough to throw out a categorical rule, but they say here's a number of situations where no one can with a straight face say it's not a spillover, 50, 60, 65 percent, things like that. They identify those, and they weren't treated as subject to, you know, as market value or any other type of project that would subject it to competition. So saying that's just automatically going to happen, they've come forward with evidence that the commission has not indicted here, and we don't have to read it as indicting. I'd be troubled. I would feel uncomfortable. I can't speak for anyone else adopting a reading that rejects a theory, a model in theory that they have used repeatedly, and the other arguments MISO makes just didn't touch those situations. So I don't think it's an answer to say that the rule works, so that any time there's more than 50 percent of the benefits going to another zone, that it'll be treated as a regional project. Your Honor, I would ask where in all of the complaints or in any of the proceedings below, did they show that there's any actual benefit, that there's any $1 of savings or $1 of extra expense based on any flow impact to any of these changes? Okay, we use the model that FERC used. Can you tell me, maybe I'm going to try it another way, can you tell me how many projects within MISO have been subject to competitive bidding since Order 1000 was issued? Your Honor, I believe we've had two projects that have been subject to competitive bidding. However, there would have been more projects except for that state- I'm sorry, and that's over a decade now? The two projects are broader than, let me just say, it's not just two discrete projects. Let me just be clear. How are you going to finish your answer to Judge Millett? Thank you, Your Honor. You said there's two projects, but there could have been more, but- There could have been more, however, several states in the MISO footprints have right of first refusal laws that would make a project that might otherwise be not competitive. So, we had some that could have qualified for that, one in Minnesota, but was not eligible as a result of that. Well, that was known at the time all these exceptions were adopted. So, two in a decade? Your Honor, I would submit that- well, two points. I would submit that there's no quota. If a BRP truly is a local project, there was no guarantee- Did you mean two BRPs, or did you mean two projects at all of any category? Sorry, and I want to make sure I understood your answer correctly. Maybe I misunderstood it. When I asked how many projects, were you telling me just baseline reliability projects or projects of any type? Was your question, Your Honor, whether the projects were competitive or how many projects- When I say project, I'm not talking just about baseline reliability. I'm talking about any projects. But there weren't multi-value projects. There weren't other things. So, maybe there's some other category you know of. Well, there's been two market efficiency projects or three market efficiency projects in that intervening timeframe, two of which have actually been put out to competition, and one of which was actually won by one of the complainant's affiliates. Okay. So, that's separate from these two. The two you were talking about were two baseline reliability projects? Market efficiency projects, Your Honor. Okay. Sorry. Go ahead. I have a much more simplistic understanding of things than you do, so I apologize. So, my question has been how many projects, and I meant projects at large, have been subject to competition? And the answer we got was two. But then, in light of Judge Rogers' question, I wanted to understand, did you mean only two baseline reliability projects have qualified for competition? Sorry, Your Honor. There have been two projects that have been found eligible for competition in MISO, total. Okay. Total. But then you just said that there were three market efficiency projects. Did one of those fall victim to this? Is that one of those that fell victim to the state right of first refusal? Yes, Your Honor. Got it. Okay. All right. Anything further? Counsel? Do you know how many market efficiency and multi-value projects have been approved for the 2020 and 2021 MISO planning cycles? Your Honor, that's actually one point that I did want to bring to the Court's attention. MVPs move cyclically. We've invested about $6.5 billion in 2011 and 2012. All the BRPs combined in that time are only about $5.3 billion. MISO just filed last week with the Commission a proposal that is intended to help produce the LRPP initiative, and that filing was—if I can look for a second and see where that filing was made—in docket ER-22-995. But the point that I want to make— Will any of those—and I don't mean to mix up categories here—but will any of those that are proposed qualify as immediate needs reliability projects? It's too soon to say, Your Honor. However, these are still proceeding through the stakeholder process. But the point that I wanted to illustrate with that is that these projects move in cycles. MISO does not build $6 billion in projects and then three years later build another few billion. These are large portfolios. So, yes, there's plenty of testimony in the underlying record about why these cycles may have been pushed out a bit longer due to lower gas prices and other industry developments. But we still do expect that there will be more MVPs. Regardless, there's not a quota. It's not appropriate simply because they want more projects to compete on to take something that isn't reasonable. Do you know how many projects total have been approved since Order 1000 was in MISO? So, we got two subject to competition. What's the denominator there out of— It's a ballpark, Your Honor, but I believe that it is somewhere in the neighborhood of 500. Two out of 500. Okay. Ballparking it. Okay. Thank you. Thank you, counsel. All right. Counsel for petitioners? Thank you, Your Honor. And Judge Millett, if you look at JAS 39 and 50— Sorry, your line's crackling up a little bit here. Did you say 49 and 50? 49 and 50 is a list of projects in MISO that have occurred since 2010. So, we'll answer all of your questions about the number of projects. Mr. Cepino is right. Only two have been competed. He is wrong about the number. For example, there were 310 other projects in 2019 alone at $2.8 billion. 2019 was the year that we wanted to challenge the going forward application of baseline reliability, not having regional benefits. There were 113 projects that year at $836 million. So, there's quite the list here, and you are correct. The two have been competed. I want to touch on something Mr. Cepino said, because he made a very strong argument that nobody has ever equated impacts with benefits. If you will look at JA 404, we quote the commission in its 2013 order saying the following, MISO explains that LODF analysis identifies the beneficiaries of a baseline reliability project based on the impact. That's exactly what we put forth. Your Honor, Judge Millett, I think what you've identified is the problem with this case. FERC hasn't addressed the actual substance of what we put forth. They simply made a conclusory analysis that we didn't meet the requirements. We didn't meet our burden of truth. Mr. Glover would have you believe that their analysis back in 2013 was that there were going to be these kinds of projects with 50, 60, or 70 percent, because he says we didn't meet the burden of showing changed circumstances. That can't be what the commission meant then. There's nothing in the record that suggests the commission meant in 2013 when they allowed this order or allowed the elimination of regional allocation that there were going to be 40, 50, 60 percent of the benefits. What we've asked is that the court send it back to the commission to actually answer all of these questions. We think we've met the standing requirements through the various standing cases to have that outcome. The court sends it back to the commission to answer these questions. Why is it appropriate to allow 50, 60, or 70 percent of the benefits to go to a zone that's not getting any of the cost? Anything further, counsel? Can I ask you what your denominator is? I could give you the answer, but unfortunately, we didn't add it up on 49 and 50. I believe the other projects, which are a separate category. I said all projects. I believe the denominator will be in a couple thousand. Your best standing case is Sierra Club, or what's your best case that you have shown enough harm? It's Sierra Club that we've established sufficient harm for the associations to show that their members are harmed both by improper cost allocation, some benefited, some harmed by improper cost allocation, and by the lack of competition. Even though you never identified them or where they are, anything like that. Counsel, that's not what Sierra Club is getting at. If you had identified, then it might be self-evident, but it's not self-evident. That's the problem. Where it isn't self-evident, Sierra Club said, file an affidavit with your opening brief. This court has gone along to say, well, if it isn't crystal clear, we'll let you do it in a reply brief as well. In any event, Sierra Club is what you're relying on, right? It is. Then on the competition piece, I just want to add on JA 46, footnotes 67 and 68, those showed the amount that the cost is increased on those projects. Because they weren't subject to competition, there's no cost caps or any other thing on those. Is anybody harmed? Evident harm. Ratepayers are harmed, which Mr. Glover said, acknowledged was an actual harm. All of our clients are ratepayers. We're trying to get you to get us within the Supreme Court. Maybe my colleagues will say you've done enough. All right, but I think we have your argument. Anything new? No. Thank you, Your Honor, for hearing us. Thank you. Thank you, counsel. We'll take the case under advisement.
judges: Rogers, Millett, Pillard